UNITED STATES MAGISTRATE COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

                                  :        10 Cr. 682 - 01 (JCF)

     - against -

                                  :

MATTHEW DELOREY

                                  :

     Defendant
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM  IN  AID  OF  SENTENCING


Nancy Lee Ennis,  Esquire
QUIJANO & ENNIS, P.C.
381 Park Avenue South, Suite 701
New York, New York 10016
(212) 686-0666 (phone)
(212) 686-8690 (fax)
nancyennis@qandelaw.com

Attorney for Matthew Delorey


1

**QUIJANO & ENNIS, P.C.**
**ATTORNEYS AT LAW**
**381 PARK AVENUE SOUTH**
**SUITE 701**
**NEW YORK, NEW YORK  10016**

TEL: (212) 686-0666
FAX: (212) 686-8690

Peter Enrique Quijano
Nancy Lee Ennis
Anna N. Sideris

October 20, 2010

**BY HAND AND BY ECF**

Honorable James C. Francis IV
United States Magistrate Judge, S.D.N.Y.
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

> **Re:**   **U.S. v. Matthew Delorey,** 10 CR 682-01 (JCF)
> **Letter in Aid of Sentencing**

Dear Judge Francis:

On behalf of my client, Matthew Delorey, I respectfully submit this letter pursuant to Fed. R. Crim. P. 32, in order to aid in the determination of the appropriate sentence.  On August 3, 2010, Mr. Delorey entered a plea of guilty to the above-referenced Misdemeanor Information pursuant to a plea agreement with the Government.  In his plea allocution, he accepted responsibility for committing fraud in connection with access to computers, in violation of 18 U.S.C. § 1030(a)(6), (e)(2)A) and 2, a Class A Misdemeanor.  Mr. Delorey's sentencing is scheduled to take place before this Court on Wednesday, November 3, 2010. For the following reasons, Mr. Delorey will ask this Court to impose a sentence of Probation.

2

Honorable James C. Francis IV
October 20, 2010

## I. THE FACTORS TO CONSIDER IN DETERMINING THE APPROPRIATE SENTENCE.

The Supreme Court in U.S. v. Booker, 543 U.S.220, 125 S. Ct. 738 (2005), held that the United States Sentencing Guidelines are not mandatory and should not be applied to the exclusion of other important factors in determining the appropriate sentence.  Accordingly, a sentencing Court is now able to give due consideration to all of the factors set forth in 18 U.S.C. § 3553 in order to fashion a sentence that is "sufficient, but not greater than necessary" to accomplish sentencing goals.   Now, post-Booker, the Guidelines are merely advisory, and a sentencing court must consider the Sentencing Commission's intent as just one of several salient factors in determining whether to impose a Guideline or non-Guideline sentence and the length of such sentence.  See, United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), and Cunningham v. California, 127 S.Ct. 856 (2007).

Any doubts regarding the practical application of Booker have been largely resolved by Gall v. United States, 128 S.Ct. 586 (Dec. 10, 2007) and Kimbrough v. United States, 128 S.Ct. 558 (Dec. 10, 2007).  Simply stated, a sentencing court may impose a sentence other than that recommended by the Guidelines if, in its discretion, it finds that the statutory regime of 18 U.S.C. § 3553(a) warrants such a sentence.  The Supreme Court has clearly determined that there is no need to find that the circumstances meriting a non-Guidelines sentence are extraordinary. *See*, Gall, 128 S.Ct. at 595 .  Indeed, sentencing judges are no longer permitted even to presume that a Guidelines sentence is *per se* reasonable; rather, the court "must make an individualized assessment of the facts presented." Id. at 597.

Thus, when the Supreme Court held that the federal sentencing Guidelines were no longer mandatory, it restored to the sentencing court the ability to fashion a sentence free of the mechanistic application of a sentencing scheme, which too often prohibited the court from giving any consideration to many significant, if less than extraordinary, factors which are directly relevant to the type and length of sentence appropriate to impose upon the individual defendant.  The Supreme Court's rejection of the mandatory application of the guidelines thus breathed renewed life into the concept that it is an *individual* who stands before the court for sentencing, and the breadth of that individual's life history and circumstances may be taken into account in the determination of the reasonable sentence.

Honorable James C. Francis IV
October 20, 2010

## A.  The Guidelines and the Pre-Sentence Report (PSR)

It is well-settled that, as the first step in determining the appropriate sentence, the Court must calculate the correct Guidelines range applicable to the defendant.  While these Guidelines calculations are not binding, they constitute one factor for the Court to consider in arriving at a suitable sentence.

As the Court will note, there is a two-level disparity between the Guidelines calculations set forth in the Plea Agreement, and those set forth in the Pre-Sentence Report ("PSR").  As a consequence, the Total Offense Level in the PSR is 12 (twelve), as opposed to the Total Offense Level of 10 (ten), which all parties had accepted in the Plea Agreement.  Unlike the Plea Agreement, the PSR adds a two-level increase pursuant to U.S.S.G. Sec. 2B1.1(b)(10)(B).  If, at first blush, the disparity appears to be relatively inconsequential, it should be noted that the Plea Agreement contemplates that Mr. Delorey would fall within Zone C (see U.S.S.G. Sec. 5C1.1 (d)), while the PSR places him in Zone D.

It is respectfully submitted that the PSR's two-level increase in Mr. Delorey's Total Offense Level provides a glaring example of the shortcomings of the mechanistic approach to sentencing that the U.S.S.G. system created.  Here, it appears that the Guidelines formula dictates a Base Offense Level for Mr. Delorey's conduct, and then adds an additional two points *for the very same conduct*.  As the PSR duly notes, the very essence of Mr. Delorey's misdemeanor plea allocution was: "I ran a website where I sold modified modems that allowed people to get free Internet service."  PSR, p. 8, par. 29. This allocution describes the offense for which Mr. Delorey stands convicted. But Sec. 2B1.1(b)(10)(B) then imposes an additional two points for "trafficking" (i.e., selling) in any "unauthorized access device" (e.g., modified modems).  Thus, the Sentencing Guidelines, through its labyrinthine network of interlocking formulae meant to address every exigency, appears in this instance to engage in a type of double-counting.  Simply stated, it enhances Mr. Delorey's Total Offense Level computation with the identical conduct originally used to calculate the Base Offense Level.

Honorable James C. Francis IV
October 20, 2010

With respect to Mr. Delorey's Criminal History Category, it is respectfully submitted that while technically correct, the computation tends to overstate his actual criminal history. Indeed, as discussed at great length in the following section, Matthew's criminal history is directly related to the grievous rejection and abuse that he was subjected to as a youth and as a young man. His prior convictions, and the context in which they occurred, are explored at considerable length in Section B, below.

In formulating the Guidelines, the U. S. Sentencing Commission recognized the potential harm of overstating a defendant's criminal history and thus exposing him to punishment in excess of what may be necessary to exact punishment and deter recidivism. U.S.S.G. §4A1.3(b)(1) states: "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." "This type of departure is most frequently used when a series of minor offenses, often committed many years before the instant offense, results in a [criminal history category] that overstates the seriousness of the defendant's prior record." U.S. v. Carrasco, 313 F.3d 750, 757 (2d Cir. 2002). To remedy that excess, the Second Circuit has determined that the sentencing judge may reduce both the Criminal History Category and the offense level in order to achieve a just result. As that Court stated in United States v. Rivers, 50 F.3d 1126, 1131 (2d Cir. 1995):

> We agree with the other circuits, that section 4A1.3 manifests the Commission's view that a sentencing judge should exercise discretion whenever the judge concludes that the consequences of the mathematical prior-history calculation, prescribed by sections 4A1.1 and 4A1.2, either underrepresents or overrepresents the seriousness of a defendant's prior record.

Of course, post-Booker, the Guidelines are only one of several salient factors which the Court needs to consider pursuant to (§3553(a)(5)(A). As noted above, the Supreme Court in Gall, supra, ruled that it is no longer appropriate for sentencing judges simply to presume that a Guidelines sentence

5

Honorable James C. Francis IV
October 20, 2010

is *per se* reasonable; rather, the court "must make an individualized assessment of the facts presented." 128 S.Ct. at 597. For that reason, to arrive at the reasonable sentence, we respectfully urge the Court to consider the history and personal characteristics of Matthew Delorey, which will be discussed next.

### B.   18 U.S.C. Sec. 3553 (a)(1) and (2)

As this Court is well-aware, the legislative frame-work to apply at the time of sentencing is 18 U.S.C. § 3553(a). The legislative meaning of 18 U.S.C. § 3553(a) is reflected in 18 U. S. C. § 3661, which states:

> *No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing a sentence.*

Ultimately, 18 U.S.C. § 3553(a) instructs the sentencing court to impose a sentence which is sufficient, but not greater than necessary, in order to comply with the purposes of sentencing as set out in paragraph (2) of §3553(a). In addition, the Court must consider the "nature and circumstances of the offense and the history and characteristics of the defendant." (§3553(a)(1)). Additionally, §3553(a)(2) provides that sentences should reflect the need to afford adequate deterrence of criminal conduct, as well as protect the public from further crimes.

### (1)    The history and personal characteristics of Matthew Delorey:

In 1983, Matthew Delorey was born in Weymouth, Massachusetts, a fading, formerly prosperous industrial town located approximately an hour south of Boston. He was the only child of Karen Dexter and William Delorey. Although he believes that his parents were married, his father was not around much by the time he was born. Matthew has a fleeting memory of meeting his father one time, when he was probably around three years old. He has had no contact with his father ever since. But growing up, he learned a great deal about his father from the stories his mother told him. She darkly described William Delorey as a trouble-maker and a criminal, who was somehow

Honorable James C. Francis IV
October 20, 2010

connected to the Italian Mafia. According to her, she left him because he always hit her and stole from her. Young Matthew was told that his father was serving time in prison for drunk driving and manslaughter, because he killed three people when he hit their car head-on. His mother's accounts of abuse at the hands of his absent father made Matthew feel deeply bound to her.

Indeed, his mother was a woman who elicited a fierce sense of devotion and protectiveness. She suffered from an incurable illness that was diagnosed as a form of cerebral palsy. In her case, the disease did not result from a pre-natal or birth injury, as it commonly does. Rather, her illness resulted from being struck by a drunk driver when she was a two-year-old toddler. As a consequence of the resulting brain injury, one-half of her body failed to fully develop. That stunted growth caused her to limp and move about with difficulty. Although Matthew is not certain of the reason, when he was very young she moved with him to nearby Quincy, Massachusetts, another economically faltering city that was losing its aging heavy industries. As a youngster, Matthew became aware that his mother was more frail and vulnerable than other mothers, and he felt determined to take care of her.

Despite her disability, however, his mother never lacked for boyfriends. Indeed, the presence of various strange boyfriends in their house frequently made Matthew feel shut out. When Matthew was still a small boy, his mother became attached to one particular man, Michael Shannon. Unlike her previous boyfriends, Michael Shannon stayed on, and became the father of two of Matthew's younger half-brothers, Corey and Eric. Although Michael Shannon drank alcohol on a daily basis, he managed to keep a regular job working as a janitor for the Town of Hull, Massachusetts. Matthew remembers him with fondness as a good father who cared for and supported his mother. That contentment was short-lived. In 1992, when Matthew was just nine years old, Michael Shannon, age 40, suddenly became ill and died. The cause of his death was cirrhosis of the liver. Suddenly, Matthew's mother was left alone with three sons to care for: Matthew, age 9; Corey, age 3; and Erik, who was less than a year old.

But in very short order, another man moved in. If his mother's loneliness was alleviated by the arrival of a new boyfriend, however, Matthew's own torment was about to begin. The new man in the house was the deceased Michael Shannon's brother, Jimmy.

Honorable James C. Francis IV
October 20, 2010

Although Michael and Jimmy were brothers, they proved to be opposites. Where Michael had been calm and easy-going, Jimmy was surly and mean-tempered.  Like his brother, Jimmy drank so steadily that he was undoubtedly an alcoholic; unlike his brother, Jimmy was a drug-abuser as well.

To young Matthew, it was apparent that Jimmy Shannon took an instant dislike to him – perhaps because he was the one young boy in the house who was not the son of the late, lamented Michael Shannon.    To Matthew, it seemed that he was the perpetual butt of Jimmy's scornful attitude and scathing words, which grew worse whenever Jimmy drank.    Matthew also grew to despise the ways in which Jimmy seemed to denigrate and belittle his mother. As he became vigilant for signs that Jimmy  was mistreating his mother, he also felt impotent to do anything about it.  Consequently, young Matthew's reaction was complicated when Jimmy was sent to jail.  Even though he was upset to see how distressed his mother was, he also felt relieved.

That relief was not to last, however.  Jimmy was out of jail before long, and back in the household.  It was during this time-frame that Matthew's difficulty in school became a major problem.  He could not concentrate, and was held back for being hyper-active and disruptive.   To treat his symptoms, the school nurse began to give him daily doses of the prescription drug Ritalin.  If the regimen of Ritalin helped him calm down in school, it did nothing to quell his constant distress at home.

When Jimmy's hostile, punitive attitude toward Matthew began to escalate, his mother would do nothing to stop it.  Jimmy would lash out and hit Matthew and his two younger step-brothers with increasing regularity.  Worse, there were times when Jimmy would hit Matthew's mother, and she would do nothing to stop that, either.  Fortunately for Matthew, Jimmy was sent back to jail again – and again.  As Matthew understands it, Jimmy's crimes were related to drugs, burglary and theft.

One time, there was cause for hope: When Matthew was 12 or 13, Jimmy received a longer jail sentence for robbery.  In Jimmy's prolonged absence, Matthew's mother became romantically involved with another man.  That man, Mark Bell, soon became the father of Matthew's youngest half-

8

Honorable James C. Francis IV
October 20, 2010

brother, Jeremy (now age 13).  Although Matthew never developed much of a relationship with Mark Bell, he had reason to hope that this new man would permanently displace Jimmy.  But as before, when Jimmy was released from prison, he returned to the house.  Matthew recalls that Jimmy seemed  nastier than ever. He kept threatening to hurt Mark Bell if he did not leave Matt's mother alone.  It was not long before Jimmy's threats succeeded, and Mark Bell vanished from the scene.  Once again, Matthew found himself trapped in the seething presence of Jimmy.

Now a teenager, Matthew was growing larger and somewhat more brave. He began to confront and defy Jimmy, objecting to his bullying.  In response, however, Jimmy beat up Matthew ruthlessly, and Matthew's  mother did nothing to stop it.  Eventually, by the time Matthew was almost 16, the situation became so intolerable that he fled to the home of his school-friend, Paul, and hid out there.  Paul's father, aware of the dire situation at home, allowed Matthew to stay with them.  It was in Paul's home that Matthew first learned to use a computer, and the two teenagers enjoyed playing an extensive array of computer games.  Once, during that time, Matthew figured out how to down-load movies without paying for them, and got Paul into some trouble with his father as a result.  Nonetheless, they seemed glad to have him stay.  Matthew was happier living at Paul's house, and wanted to remain.  Unfortunately, his living situation came to the attention of the Department of Social Services, which intervened, probably at the instigation of his mother.  Matthew was advised that, because he was still under-age, the child welfare authorities still exercised legal jurisdiction over him.  As a result of their intervention, Matthew was ordered to move back into his mother's home.  The problem was that Jimmy was still living there, and things had not improved.

Left without other recourse, Matt moved out of the house as soon as he reached age 17.  He was homeless, and living in a car.  Since he had to find a way to support himself, he had to drop out of school.  Nevertheless, he had a promising plan: to join the army.  The local military recruiters were supportive; they arranged for him to take his G.E.D. exam, and to go to Boston for further testing.  He passed his G.E.D. exam, and received a high-school equivalency degree. When the preliminary military test results seemed to confirm his eligibility for enlistment, the recruiters drove Matt and other new recruits to Maine for additional admission tests and orientation.  The path seemed clear for his entry into the army until a last-minute glitch occurred.  The

9

Honorable James C. Francis IV
October 20, 2010

military medical screeners discovered that he had taken Ritalin in school, and that made him ineligible for service.  To his shock, Matthew learned that the army had a strict rule denying enlistment to applicants who had taken Ritalin.

Matthew did not have a Plan B.  Still living in his car, he scrounged around for work and found odd jobs, but had trouble making ends meet.  To buy food and clothing, he wrote several bad checks at the local Roche grocery store and at Wal-Mart.  He knew that he didn't have enough in his bank account to cover those checks, but hoped that maybe he would suddenly become lucky, earn money and deposit it before the checks were cashed.  Instead, those bad checks resulted in his first arrest, for a misdemeanor, at age 17 or 18.  Rootless, he failed to show up in court, and unbeknownst to him, a bench warrant was issued that remained outstanding for the next four years.

Finally, he found a steady job as a telemarketer selling time-shares.  He was able to move out of his car and into a run-down local motel with his girl-friend at the time.  For almost a year, they both worked selling time-shares, and split the rent of $230 per week. But the time-share business was losing money.  When the business finally failed and their work-place shut down, Matthew and his girl-friend decided to try their luck in Florida.  They made their way in an old car to Fort Myers, on the Gulf Coast, where they found work in a Winn-Dixie grocery store.  On January 27, 2002, they became the parents of a baby boy, Matthew Justin Delorey.

Over a span of two years, Matthew rose to the position of Assistant Manager at the Winn-Dixie store, and supported his girlfriend and baby son.  But even as he began to get ahead at work, his situation at home started to deteriorate.  His girl-friend began to suspect Matthew of having an affair with another woman – a suspicion he insists was unwarranted.  It reached the point where, every time he came home, she began hurling angry accusations that he was cheating on her, and ordering him to get out of the house.  One night he left, but soon returned to deny her allegations and to plead his case.  Their arguing came to a head that night, when she called the police and accused Matthew of shoving a chair at her.  Matthew waited for the police to arrive and told them that, contrary to her claims, he had not done anything toward her that was physically threatening, and would not do so.  The police advised him that the

Honorable James C. Francis IV
October 20, 2010

best thing to do would be to leave the house. He complied. In the aftermath, his girlfriend made it clear that she was through with him. Feeling defeated, he not only left his house, but also left his job and left Florida, unsure of where he should go.

Matthew headed back to the only place that he knew, Massachusetts, and for a few months stayed at his mother's house in order to get his bearings. He tried to avoid being in the house whenever Jimmy was around. Eventually, he found work at a local gas station, but that job ended when his boss noticed that a number of scratch-off lottery tickets were missing, and suspected Matt of stealing them. Although Matthew vehemently denied the accusation, his boss insisted on docking his pay in order to recoup the value of the scratch-tickets. Knowing that he had been wrongly accused, Matthew quit that job rather than agreeing to have his pay docked. Matt later learned that, in order to account for the missing scratch-tickets with the lottery authorities, Matt's boss filed a charge against him for theft. During this same time-frame, Matthew's mother threw him out of the house because she did not like the girl that Matthew was beginning to date. Once again, he was living in his car.

Eventually, Matthew found refuge in the only place in Massachusetts that he truly felt welcome: the home of his old friend, Paul Johnson, and Paul's father Lane. They invited him to stay, which he did. After finding a job at the Walgreen's Store right down the street, Matt began paying Paul's dad $50.00 per week for rent. Living with Paul again, Matthew began to immerse himself in the computer world as he had done when the boys were in high school. The two played long, on-going games of Counter Terrorist Strike, downloaded Visual Studio 205, and developed speed hacking skills, such as learning how to alter counter-strike servers and removing time-tickers. Matthew remained living there until it became necessary for Paul's father to sell his house. Matt calculates that, over time, he spent a total of approximately four years staying with Paul and his father on-and-off, and describes them as the best – and safest – time of his life. During this time, he always kept in touch with his mother, and frequently visited her, in spite of his fear of Jimmy.

After Paul's father had sold his home, Matt and his girlfriend went to stay at his mother's house as a temporary measure. His girlfriend at the time, who was from neighboring New Hampshire, had also lost her home, and had been living in her SUV. She kept all of her belongings – including her clothing,

11

Honorable James C. Francis IV
October 20, 2010

shoes and two hunting rifles that she had purchased at Wal-Mart – stored in her SUV, but because it was cold, slept inside Matt's mother's house.   Matt found a job at Stop 'n Shop working on the overnight shift.   Since his work hours required him to sleep during the day, he managed to avoid having much contact with Jimmy.   But one morning nearly six years ago, his girlfriend came to pick him up from work, and Matt could tell that something was wrong.   She was reluctant to answer his inquiries, telling him that he would be upset.   But finally, she revealed what had happened.   Matt has provided the following account of that day:

> She said that Jimmy beat the crap out of my mother, and that the cops were there.  I asked what happened.  She said my mother came downstairs to make coffee (heat the kettle up on the stove) and then she went back to bed for about 10 minutes.  She said Jimmy came down the stairs yelling and screaming "where's my fucking coffee; where the fuck is it." Then she said that Jimmy went back upstairs, grabbed my mother by the hair and pulled her down the stairs.  She was crying and screaming for my girlfriend to call the cops. Jimmy said to my girlfriend, "don't you fucking move," so she just stood there.  After he let go of my mother's hair, she was in the kitchen downstairs – my mother and my girlfriend – and Jimmy shoved my mother up against the chairs at the table, he took the chair and broke it against the wall, and it broke into pieces.  After that he picked up one of the broken pieces of wood and threatened to stab her with it, standing over her.  Then he punched my mother in the face, and then grabbed the boiling hot water kettle, and held it over her like he was going to pour it on her.  By that time the cops were called by the neighbors, and he was arrested.  I came home to see my mother with a bloody face, and that cop car that had him in it was pulling away as I got home.

This time, Matt was spurred by anger into asserting himself and taking charge.  He told his mother that he didn't ever want Jimmy coming back to the house, and he thought that she seemed to assent.  He went out to his girlfriend's

Honorable James C. Francis IV
October 20, 2010

SUV and brought her hunting rifles – which were registered in New Hampshire – into the house for protection, in case Jimmy returned. Eventually, after a month had passed, Jimmy was let out of jail, and returned directly to the house.

It was at that moment that Matthew's mother shocked him and broke his heart. She took Jimmy back, and ordered Matt and his girlfriend to leave, saying that Jimmy had told her to do so. Feeling grief-stricken and angry, Matthew collected his own and his girlfriend's belongings, and they moved back into the SUV. What happened next was worse: Matthew's mother told Jimmy about the hunting rifles being stored in Matt's girlfriend's SUV. One day Matt dropped by the house to pick up a camera, telling his mother that he needed to return it to Wal-Mart. Either she told Jimmy, or Jimmy overheard the conversation. When Matt and his girlfriend arrived at the Wal-Mart, police were waiting for them and surrounded the SUV. Jimmy had called the police to report that they possessed firearms.

The police had already run Matthew's name through their computer system, and had discovered that he had old warrants for the bad checks he had written years earlier, as well as for the scratch-ticket charge lodged by his old boss at the gas-station. As the police confronted Matthew, demanding to see his I.D., his girlfriend began to cry uncontrollably. When the police searched the SUV, found the rifles, and asked who they belonged to, Matthew said they were his, because he did not want his frightened girlfriend to get into trouble. Later on, Matthew's girlfriend not only claimed ownership of the rifles, but also was able to prove that she had purchased them at a Wal-Mart's in her home state of New Hampshire. The SUV where the guns were found was demonstrably her vehicle, not Matthew's; he had no ownership interest in that car. The guns were registered in her home state of New Hampshire (but not in Massachusetts). Nonetheless, Matthew's court-appointed lawyer told him that he was guilty because he had stated to the police that the guns were his. In the end, both Matthew and his girlfriend pleaded guilty to felony charges. To satisfy the gun case and the old misdemeanor warrants,[1] Matthew ultimately served 45 days in jail, and received a term of probation of 2 ½ years, which he completed on March 10, 2010. For the next

---

[1] Which may have been time-barred, but also went uncontested by Matthew's lawyer

13

Honorable James C. Francis IV
October 20, 2010

year or so, Matthew went to live with his girlfriend and her mother in New Hampshire.  Work was scarce, however, and gradually that relationship fell apart.

Approximately three years ago, Matthew met his present girlfriend, Kristina Belli, on-line.  Since she had a steady job for several years at Crayon Campus, a pre-school program in New Bedford, Mass., Matthew eventually moved to New Bedford to join her and her two children, Seth and Emma.  There he found a job that he really liked, in the inventory department at a golf cart distributing company.  The business supplied, serviced and maintained golf carts to country clubs in the area.  Matthew was working there when his girlfriend became pregnant, but by the time that the baby, Noah Bell Delorey, was born, his job was disappearing.  Unfortunately, because of bad economic times, the golf cart company was struggling.  It announced that lay-offs would occur in three months' time.  During that time-frame, Matthew filled out many other job applications, but nothing came through.  After he had already been laid off for two months and still found nothing, he began to become panic-stricken, fearing that he would never find another job.  He was unable to contribute to the support of his girlfriend's two children and their new baby boy.

**(2)    *The nature and circumstances of Matthew Delorey's involvement in this offense:***

It was the autumn of 2008, and although Matthew spent a great deal of time conducting a job-search, he had no success.  Jobless, and lacking any promising job prospects in the worsening economy, Matthew decided to create a website, which he originally designed as "a place where people could discuss things."   But when it became apparent that such a venture would not be profitable, he decided instead to set up a site called "MassModz," where he intended to sell car parts.  Little came of that effort, either.  With no job to go to, Matthew began spending hours and hours on the internet, immersing himself in the study of other website "stores," in the hopes of developing a profitable plan.  The first "store" he created offered to sell modifications to customers' gaming consoles (such as Nintendo and Wii), but the sales proved to be meager.  That is when Matthew discovered the flourishing cable modem-modification business, in December, 2008.  On the internet, he plugged into an ongoing

Honorable James C. Francis IV
October 20, 2010

discussion among a whole community of self-described "hackers" who took great pride in their expertise. They not only talked about, but actively advocated, the modification of cable modems in order to gain access to high-speed internet. In their *e*-exchanges they seemed aggressive and savvy, and reported considerable success. Through internet conversations with them, and by studying and practicing, Matthew taught himself the art of "flashing" or re-configuring cable modems. His ability to master the technology gave him a new-found sense of accomplishment and skill. It was not long before his "store" was openly advertising his services for modifying cable modems.

In a constant stream of on-line discussions, the hackers argued that providing access to high-speed internet is a First Amendment right which cannot be abridged by big business or the Government. Matthew felt inspired by their discussions of the First Amendment, and saw it that way too. He also took satisfaction in the belief that he was helping out people too poor to afford access to the internet through the giant corporation Comcast. (Comcast had cut off his service on more than one occasion when he could not afford to pay). Matthew became feverishly involved with his new internet venture, frequently staying up around the clock to communicate with his newly-discovered friends in the hacker community. Belonging to this new-found "brotherhood" helped him overcome his isolation and loneliness. At this juncture, Matt felt a bracing sense of solidarity with the on-line computer community. For the first time in his life, he believed that he was soaring to success. He had a new sense of self-awareness, and began to see himself as a gifted computer genius.

But Matthew's lack of awareness of, or attention to, the legal ramifications of "modem-flashing" conduct is evident. He openly placed advertisements on his internet "store" site, which plainly offered "free untraceable internet." Without any attempt at concealment, he proclaimed the nature of his services, and avidly discussed them on-line with potential customers in great detail. He made no effort to disguise his identity or hide his relationship to his web address. Indeed, when he learned from the internet community that someone had been indicted for similar activity in November, 2009, he announced that fact on his website, and then added a warning that he was selling "default string settings" only as a diagnostic tool, and "not for you to get services for free." During the months that he engaged in this business, he neither employed stealth, nor gave sufficient thought to the criminal nature of

Honorable James C. Francis IV
October 20, 2010

his activity.   Instead, he plunged exuberantly into this new hacker world, learning its lingo and communicating with its cast of characters. Ultimately, it was the very open and highly visible nature of his own internet activity and his website advertisements which invited his arrest.

What Matthew did not recognize at the time was that he was undoubtedly caught up in a manic phase of his then-undiagnosed Bipolar Disorder.  During that time-frame, Matt felt constantly driven, elated and excited by his computer activity.  In the aftermath of his arrest, however, he grew increasingly deflated and withdrawn.  It was only natural, of course, that the external realities affected him adversely.  At first, Matthew filled out a slew of job applications in the vicinity of his home in New Bedford, Massachusetts.  In the prevailing job market, however, no employer was interested in hiring a young man with few credentials and an open federal criminal case.  Consequently, Matthew  began serving as a "house-husband," providing child-care, cooking and other home-making skills while his girlfriend worked at a day-care center on a daily basis. Because he adores his girlfriend's two older children as if they were his own, and because he is delighted by his own baby son, Noah, Matthew actually came to enjoy the role of "house-husband."  Indeed, the whole household has come to depend upon him as a "stay-at-home dad." (*See* Exhibit A, letter from Kristina Belli).

But increasingly, Matthew's girlfriend became concerned because she saw that he was experiencing considerable difficulty in leaving the house.  Indeed, except for the times when he was with her and their children, his life became one of seclusion.  Although Matthew forced himself to overcome paralyzing feelings of anxiety in order to take his children to school or to the park to play, he would rush back to the safety of his home.  For days at a time, Matthew could not face the prospect of going outdoors alone.  He has reported great discomfort in his own body. Initially, both Matt and his girlfriend attributed his immobility to a "normal" depression caused by the fact of his arrest.  As he sank further into despondency, however, his girlfriend became worried that something much worse was wrong.

Honorable James C. Francis IV
October 20, 2010

Eventually, at his girlfriend's behest, Matthew agreed to see a psychiatrist. What he has recently learned from the doctor's examination and test results has been eye-opening to him.  The psychiatrist diagnosed Matthew as suffering from Bipolar Disorder, Most Recent Episode Manic, Moderate (*See* Exhibit B, Psychiatric Report of Dr. Guillermo Gonzalez, and Exhibit C, DSM-IV Diagnostic Categories (Excerpt)).  The doctor further advised Matthew that his social phobias are anxiety disorders related to his disease.  To treat the principal disease, Dr. Gonzalez has prescribed a psychopharmacological regimen of Lithium Carbonate and Risperidone.  For the accompanying anxiety phobias, Matthew is being treated with the prescription drug Clonazepam.  Matthew is still in the process of adjusting to this new treatment regimen, but is very hopeful that it may help lift him out of the black despair that has possessed him.

Despite receiving the daunting diagnosis of Bipolar Disorder, Matthew expresses gratitude that he has gained important knowledge; it is helping him to understand why he has acted in certain ways.  He has discovered that his frenzied obsession with the computer hacker world, followed by his plunge into a very dark depression, is symptomatic of the disease that he will now have to learn to live with on a daily basis.  Coming to terms with the knowledge that he has Bipolar Disorder is an important step in Matthew Delorey's development.  Now, for the sake of his children, he is determined to learn to manage his disease.  By adhering to his prescription regimen, and by continuing to cooperate with a plan of psychological treatment, Matthew is actively participating in his own rehabilitation.

It is instructive to note that the Second Circuit has long recognized that the sentencing Guidelines never  adequately took into account a defendant's own efforts at personal rehabilitation.  U.S. v. Core, 125 F.3d 74 (2d Cir. 1997); U.S. v. Workman, 80 F.3d 688 (2d Cir. 1996).  In U.S. v. Maier, 975 F.2d 944 (2d Cir. 1992), the Court held, for example,  that a defendant's post-offense rehabilitation from narcotics addiction was a factor not adequately considered in the Guidelines, and thus was a permissible basis for a downward departure.  It noted that "awareness of one's circumstances and the demonstrated willingness to act to achieve rehabilitation, thereby benefitting the individual and society," *id*., can remove a case from the heartland of typical

17

Honorable James C. Francis IV
October 20, 2010

cases, thus constituting a valid basis for departure.   Here, such reasoning is equally applicable in fashioning a non-Guidelines sentence.

### *Matthew's Efforts to Provide Substantial Assistance to the Government*

When Matthew was arrested by federal agents in February, 2010, he was shocked, but immediately agreed to cooperate with the authorities.  Even though the Government's search-warrant only covered the third floor of the house where he was living with his girlfriend, her children and their baby, he permitted agents to search the second floor, as well.  After signing a waiver of his Miranda rights, he brought the agents into his home-office and showed them how he "flashed" cable modems, using a USBJtag NT and a homemade jtag serial cable connecting to the motherboard of the cable modem.   Indeed, he believes that he answered all of their questions, and agreed to continue to provide information in the future.

At first, Matthew was taken to the District of Massachusetts in Boston for presentment, and released under pre-trial supervision. He was directed to appear in court in Manhattan, which he did voluntarily.  Matthew remained determined to cooperate, and offered to provide federal agents with a step-by-step tutorial so they could learn how computer programming modifications are performed.   In preparation for a proffer session, he also located records and obtained information to guide officers to the community of hackers that remains highly active on the internet.

At a proffer session with the agents and Assistant U. S. Attorneys, Matthew described his computer re-configuring activities, and answered their extensive questions. It is apparent that neither the agents nor the Government doubted Matt's willingness to cooperate to the best of his ability. At the end of the day, however, two things became obvious:

- First, Matt's self-taught computer knowledge is actually quite rudimentary.  Indeed, the agents' body of technical knowledge is already light-years ahead of his.  Therefore, Matt's sincere offer to teach the agents everything he knows about computer hacking and

Honorable James C. Francis IV
October 20, 2010

re-configuring is of little use to them, because his knowledge lacks a necessary level of sophistication.

• Second, the criminal charges against Matt were widely broadcast on the internet by a hacker, who sent out an alarm to the hacker community, and distributed a copy of the criminal complaint that was filed on ECF immediately following Matt's arrest. (The complaint was downloaded by the hacker from an ECF posting in the District of Massachusetts - Boston). Consequently, through no fault of his own, Matt's situation became so compromised that there was no realistic way that he could work pro-actively with the agents in their on-going investigations. (Initially, they had hoped that he could help lead them to others actively involved in the hacker community, but his exposure made that impossible).

As a result, the Government ultimately determined that Matthew was not a good candidate for a cooperation agreement, despite his good-faith offer to cooperate from the time of his arrest.

The Second Circuit in U.S. v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006), has recognized that a sentencing court may consider a defendant's "particular efforts to cooperate and what those efforts showed about this defendant's 'history and characteristics,'" under 18 U.S.C. §3553(a)(1), even when those efforts have failed to secure a 5K1.1 letter from the Government. In other words, an attempt to cooperate, even if ultimately deemed to be a failed attempt, may nevertheless be a 3553(a) factor for the sentencing court to consider in arriving at a reasonable sentence. The Second Circuit reasoned that a failed attempt at cooperation is a viable ground under §3553(a)(1) because that section is "worded broadly" and "contains no express limitations as to what 'history and characteristics of the defendant' are relevant. This sweeping provision presumably includes the history of the defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation." Fernandez, 443 F.3d at 33. In United States v. Kenneth Cobb, 03 Cr. 964 (EDNY) (Block, J.) (transcript of 12-10-07 and 12-13-07), Judge Block credited information provided during several proffer sessions and imposed a sentence of 210 months rather than 324-month guideline range, despite the lack of a 5K1.1 letter. See also United States v. Machitidze, 05 CR. 327 (S.D.N.Y. May 24,

Honorable James C. Francis IV

October 20, 2010

2006) (Holwell, J.) (sentence of 30 months despite Guidelines range of 33 to 41 months was appropriate in this case "in light of the defendant's personal history and specifically his efforts to cooperate with the government in this case.")

Here, because Matthew Delorey undeniably made an earnest attempt to cooperate, and shared as much knowledge as he possessed, he respectfully asks the court to consider that his good-faith efforts to assist the Government demonstrate his determination to renounce criminal activity, to seek suitable treatment for his psychological disorders, and to become a good, responsible father to his girlfriend's children and his baby son.

## II. <u>CONCLUSION</u>

It is most respectfully submitted that a non-guideline sentence of Probation would be more than sufficient, but not greater than necessary, to accomplish the goals and objectives of §3553.   In light of Matthew Delorey's need to carry on with treatment of his recently-discovered Bipolar Disorder, and to confer with his psychiatrist regularly to determine whether adjustments in his prescription medication are warranted, such a sentence would be appropriate.   It would afford effective supervision (while also affording sufficient recourse to the Court, in the event that Matthew failed to comply with the requirements of Probation) . Indeed, a sentence enabling Mr. Delorey to continue to receive consistent medical treatment for his Bipolar Disorder would also be the sentence that is most likely to protect the public from future crimes by him.

Accordingly, for all the foregoing reasons, it is respectfully requested that the Court sentence Matthew Delorey to a term of Probation.  Should the Court determine that a sentence of Probation is not appropriate, however, Mr. Delorey respectfully asks this Court to recommend that he be assigned to a facility in the vicinity of greater Boston, Massachusetts, so that his girlfriend and children will be able to visit him.  Finally, since Mr. Delorey has repeatedly demonstrated his willing 0readiness to appear, it is respectfully requested that the Court permit him to report voluntarily to such facility at a future date.

Honorable James C. Francis IV

October 20, 2010


    Your Honor's attention to and consideration of this submission are greatly appreciated.


                          Respectfully submitted,


                          Nancy Lee Ennis


cc:    A.U.S.A.  Ryan Poscablo (by e-mail and by hand)

       U.S. Probation Officer Thomas J. McCarthy (By e-mail and by fax)